UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TERRY PADGETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 1:20-CV-233-HAB |
| ) | |
| NORFOLK SOUTHERN RAILWAY ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff worked for Defendant for sixteen years until he was terminated for what Defendant claims was rampant absenteeism. Plaintiff challenges that reason, claiming instead that he was fired because of disability discrimination and in retaliation for reporting that discrimination. Defendant has moved for summary judgment (ECF No. 30), and the motion is fully briefed (ECF Nos. 31, 38, 40).

**I.   Factual Background**

Plaintiff was hired by Defendant as a conductor in 2003 before being promoted to engineer five years later. Throughout his tenure, Plaintiff was subject to Defendant's attendance policy which provides, in relevant part:

> All operating employees are full-time employees. [E]mployees will be required to perform or be able to fully meet the needs of [Norfolk Southern]. Therefore, employees will be required to maintain an acceptable work record. Contingent upon the needs of service, reasonable mark-offs privileges will be permitted.

(ECF No. 31-2 at 9). Violators were subject to a five-step disciplinary policy, ending in termination. The attendance policy was updated in 2019[1] to state that "employees with chargeable

---

[1] Plaintiff asserts that the 2019 modification was never ratified by his union.

mark-offs that cover more than three weekdays or more than one weekend day (Friday-Sunday) in a 90 day period will be reviewed for handling under the Norfolk Southern T&E Attendance Policy." (*Id*. at 12).

Plaintiff was involved in a worksite accident in 2011. The accident left Plaintiff with a herniated disc in his lumbar spine. Plaintiff alleges several ill-effects from the accident in his personal life, including an inability to jog and horseback ride, and a limited ability to perform chores and housework. As for his employment, Plaintiff was placed on a temporary lifting restriction and reports pain when turning and performing coupling jobs. Plaintiff could perform all these tasks, though with pain. While Plaintiff reports that he continues to receive treatment on his back, he has not been on medical leave since late 2015. No medical restrictions have been in place since that leave ended.

Plaintiff's attendance issues began in August 2013 when he was processed through Step 1 of the attendance policy for failing to have an acceptable work record from June through August 2013. Plaintiff received a letter of caution at this step, signed by Joseph Eveland ("Eveland"), Plaintiff's supervisor. The letter confirmed that Plaintiff and Eveland had reviewed the attendance policy.

In January 2014, Eveland again cited Plaintiff for a failure to have an acceptable work record, this time from November 2013 through January 2014. Following an investigatory hearing, Trainmaster Allen Lockhart ("Lockhart") found that discipline was warranted and issued a letter of reprimand to Plaintiff under Step 2 of the attendance policy. Plaintiff's union, the Brotherhood of Locomotive Engineers and Trainmen ("BLET") appealed the discipline to Defendant's Division Superintendent, who denied the appeal.

2

In December 2014, Plaintiff was again charged by Eveland for failure to have an acceptable work record, this time from October through December 2014. Following an investigation, Lockhart found that discipline was warranted and issued a 15-day deferred suspension. BLET again appealed Lockhart's decision, twice this time, and both appeals were denied.

In January 2018, Rail Operations Manager Scott DeLucca ("DeLucca") charged Plaintiff with failure to have an acceptable work record from November 2017 through January 2018. Following an investigative hearing, Terminal Superintendent Jeremy Holmes ("Holmes") found that discipline was warranted and recommended that Plaintiff again be given a 15-day deferred suspension. This was a repeat of Step 3 because, under the attendance policy, a disciplinary step would be repeated if the prior discipline was more than 24 months old. BLET again appealed the decision twice, and both appeals were denied.

Nine months later, Plaintiff was again charged with failure to have an acceptable work record. The period for this violation was August through October 2018. This charge was brought be Senior Road Manager Damion Wilson ("Wilson"). Following an investigative hearing, Terry Rooks ("Rooks") found that discipline was warranted and assessed a 30-day deferred suspension under Step 4 of the attendance policy. BLET again appealed the suspension twice, and again failed twice.

The final straw was in August 2019 when Wilson again charged Plaintiff with failure to have an acceptable work record. The period for this violation was July through August 2019, and this was the first charge subject to the 2019 modification to the attendance policy. During this thirty-day period, Plaintiff marked off work for all or a portion of twelve days—six weekend days and six weekdays. Following an investigative hearing, Holmes again found that discipline was warranted and recommended that Plaintiff be dismissed under Step 5 of the attendance policy. The

3

dismissal recommendation was approved by Norfolk Southern Division Superintendent Brian Stanley ("Stanley"). BLET appealed the decision, but the appeal was denied.

Interspersed in the discipline were complaints made by Plaintiff about his working conditions. In May 2017, Plaintiff filed an internal complaint alleging that Wilson was discriminating against him based on race (Plaintiff is white and Wilson is black). Lockhart investigated the complaint and determined that Wilson had violated no company policy.

In February 2018, six days after his second 15-day deferred suspension was issued, Plaintiff called Defendant's internal EEO hotline to complain that he could not attend doctor's appointments because he was not home during his days off. The complaint led to a meeting between Plaintiff, a BLET representative, and Norfolk Southern Terminal Superintendent Aaron Sherman ("Sherman"). At the meeting, the parties resolved the complaint by setting new guidelines for Plaintiff to report his need for time off for doctor's appointments. Plaintiff then had no issue attending doctor's appointments on his days off.

The day after the investigative hearing into Plaintiff's Step 4 discipline, he filed a third internal complaint alleging "harassment" by Wilson. Lockhart met with Plaintiff to investigate the complaint, but Plaintiff refused to provide any information "on advice of counsel." Defendant continues to deny any knowledge about the harassment alleged in the third internal complaint.

## II. Legal Analysis

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651,

654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.     *No Reasonable Jury Could Find that Defendant Violated the ADA***

The ADA prohibits employers from discriminating against a "qualified individual" based on his disability. 42 U.S.C. § 12112(a). To prove a claim of disability discrimination, Plaintiff "must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citing *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)); *Squibb v. Mem'l Med. Ctr.*, 497 F.3d

775, 780-81 (7th Cir. 2007) ("A plaintiff seeking to avoid summary judgment must demonstrate that there is at least a genuine issue of material fact as to whether he is disabled, whether he can perform the essential functions of the position, and whether he has suffered an adverse employment action because of his disability."). The language of the ADA requires proof of "but for" causation. *See A.H. by Holzmueller v. Ill. High Sch. Assoc.*, 881 F.3d 587, 593 (7th Cir. 2018). To defeat summary judgment, Plaintiff must adduce evidence that, when considered as a whole, would permit a reasonable jury to find that the defendant took adverse action against him because of his disability. *See Monroe*, 871 F.3d at 504.

Plaintiff has not invoked the burden shifting methodologies in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for his ADA claim, and therefore the Court will review this claim under the default method. Under that method, the test for whether a claim of intentional discrimination should proceed to a jury is whether the admissible evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's disability caused the adverse action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (setting out the standard for avoiding summary judgment on discrimination claim under the direct method of proof). In all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also Liu v. Cook Cnty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Plaintiff believes that the only issue before the Court on his ADA claim is whether his disability was the but-for cause of his termination. (ECF No. 38 at 23). The Court cannot agree. Defendant expressly raised the question of whether Plaintiff was disabled during the relevant period. (*See* ECF No. 31 at 13) ("Therefore, there is no record support which could lead to a conclusion that Plaintiff was indeed disabled during the period at issue."). But the Court sees little reason to wade into the complexities of Plaintiff's individual medical condition because it agrees with Defendant that there is no evidence Plaintiff's termination was in any way related to his back condition.

The Court's analysis of the ADA discrimination claim is hampered by Plaintiff's refusal to independently analyze this claim. Instead, Plaintiff "directs the Court" to his ADA retaliation arguments. (ECF No. 38 at 23). Of course, some of these arguments, particularly the timing argument, must be evaluated in substantively different ways depending on the claim. Plaintiff's approach, while efficient for him, has caused the Court more work.

In any event, Plaintiff raises three arguments in support of his claim that he was terminated because of his disability: timing; a "cat's paw" theory; and a claim that his attendance issues were a pretextual reason for his termination. The Court will address each in turn.

**1.** *Timing*

The timing of the dismissal works against Plaintiff. Plaintiff was injured in 2011 and, as Plaintiff argues, Defendant knew of the injury immediately. Yet Plaintiff was not terminated until 2019. This eight-year separation suggests that the termination resulted from something other than Plaintiff's claimed disability. *See, e.g.*, *Darchak v. City of Chicago*, 580 F.3d 622, 632 (7th Cir. 2009) ("we have previously found that three or four months" not too long to defeat the inference of a causal nexus).

7

**2.** *Cat's Paw*

Plaintiff identifies Wilson as the individual who discriminated against him. This is problematic because, as Defendant notes, the recommendation to terminate Plaintiff was made by Holmes, approved by Stanley, and upheld on appeal. To get around the fact that Wilson was not the ultimate decision maker, Plaintiff puts forward a cat's paw theory of liability.

In the employment discrimination context, the cat's paw theory of liability applies when "a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 828 (7th Cir. 2014) (internal citations omitted). The cat's paw theory requires both evidence that the biased subordinate harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action. *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013).

Plaintiff's theory goes like this. Wilson "had discriminatory intent towards [Plaintiff] and . . . because Wilson was the charging officer in [Plaintiff's] final two attendance steps, Wilson acted as a cat's paw to other decision makers, imparting his retaliatory intent to those actors." (ECF No. 38 at 17). Ignoring, for a moment, that Plaintiff confuses the cat with the monkey[2], he cannot show that Wilson's word was the "singular influence" in the termination.

As the Seventh Circuit has said,

> But the rule we developed in *Brewer* does not require the decisionmaker to be a paragon of independence. It is enough that the decision-maker "is not wholly dependent on a single source of information" and conducts her "own investigation into the facts relevant to the decision" To require much more than that would be to

---

[2] There are many versions of the cat's paw fable. All are a variation on a similar story: a monkey persuades a cat to retrieve chestnuts roasting on an open fire, either by flattery or by the promise of a share of the spoils. The cat burns himself grabbing the nuts and, when he is done, finds that the monkey has absconded with the fruits of his labor. In Plaintiff's version, Wilson is the monkey, and the decisionmakers are the cats.

8

> ignore the realities of the workplace. Decisionmakers usually have to rely on others' opinions to some extent because they are removed from the underlying situation. But to be a cat's paw requires more; true to the fable, it requires a blind reliance, the stuff of "singular influence."

*Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009); *reversed on other grounds* 562 U.S. 411 (2011). Defendant conducted its own investigation into the charges against Plaintiff. The Step 4 discipline had two layers of oversight above Wilson, the Step 5 discipline three layers. And these layers were not cursory; the transcript of the Step 5 disciplinary hearing is at least[3] fifty-one pages long. (ECF No. 38-3 at 3-28). The Court is convinced that these layers of review refute any suggestion of a cat's paw scenario.

Nor is the Court persuaded by Plaintiff's position that the Step 4 and 5 disciplinary proceedings would not have proceeded without Wilson's instigation. Plaintiff's argument is both true and irrelevant. Wilson was Plaintiff's supervisor, the natural person to bring Plaintiff's attendance issues to light. To draw a nefarious inference from the fact that Wilson brought the charges is to "ignore the realities of the workplace." *Staub*, 560 F.3d at 659. It is unreasonable to expect anyone other than Plaintiff's supervisor to raise these issues.

And this is to say nothing of the fact that Wilson wasn't even involved in two-thirds of the attendance-related discipline. Why, the Court must ask, should it draw a discriminatory inference from the last two steps of discipline if there is no complaint about the first three? Would Plaintiff have the Court believe that his attendance was an actual problem through January 2018, but a complete pretext after? Such a logical leap would require significant evidentiary support. That support is lacking here.

---

[3] Plaintiff's exhibit provides the Court with only the odd-numbered pages of the transcript. The last line of the exhibit, "I have a short statement," suggests that there are additional pages that were not provided. (ECF No. 38-3 at 28).

In short, Plaintiff was not terminated because a clever monkey was whispering sweet nothings into the ear of a gullible cat. The decisionmakers on Plaintiff's termination conducted thorough investigations, long hearings, and multiple levels of appellate review before finalizing his firing. This is all the law requires. Whether Wilson harbored discriminatory intent, Defendant did enough to insulate that intent from its decisionmakers. The cat's paw theory cannot save Plaintiff's discrimination claim.

**3.**     *Pretext*

Finally, Plaintiff tries to show that his attendance issues which, as you will recall, involved marking off work for all or a portion of twelve days—six weekend days and six weekdays—in a thirty-day period, were pretext to disguise the true discriminatory reason for his termination. But, as even Plaintiff recognizes, his arguments on this front are little more than speculation and conjecture. Those things are not evidence and cannot save Plaintiff's discrimination claim.

Pretext, a concept usually at issue in cases using the *McDonnell Douglas* test, means "a fabrication, designed to conceal an unlawful reason"; it is "something worse than a business error," where "deceit [is] used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000) (citation omitted). To show pretext, a plaintiff can present evidence showing that: (1) the defendant was "more likely than not motivated by a discriminatory reason"; or (2) the defendant's stated reason is not credible. *Alexander v. Wisc. Dept. of Health & Fam. Servs.*, 263 F.3d 673, 682 (7th Cir. 2001) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993)). When considering pretext at the summary judgment stage, "the only question before [the Court] is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies." *Alexander*, 263 F.3d at 683. "In determining whether the employer's reason can be characterized

10

as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020); *see also Seymour-Reed v. Forest Pres. Dist. of DuPage Cnty.*, 752 F. App'x 331, 335 (7th Cir. 2018) ("[A] pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness.").

Plaintiff offers two reasons why he believes his attendance was merely a pretext for a discriminatory firing. First, he claims that "Defendant's attendance policy is vague and easily susceptible to bad actors such as Wilson." (ECF No. 38 at 19). Next, he claims that "two similarly situated employees were granted favorable treatment under the policy." (*Id.*). The Court is not persuaded by either argument.

Plaintiff dooms his own argument on the vagueness of the attendance policy when he admits that the entire argument is "speculation." (*Id.* at 20). While the Court must draw every reasonable inference in Plaintiff's favor, that deference does not extend to "drawing inferences that are supported only by speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (quotations omitted). Without some evidence that Defendant did apply the attendance policy in a discriminatory manner, Plaintiff's speculation cannot carry the day.

This leads to Plaintiff's second argument, where he tries to show discrepancies in how the attendance policy was enforced. Plaintiff identifies two coworkers, Mike Mays ("Mays") and Matt Klausing ("Klausing"), who he claims were allowed to manipulate the attendance policy to avoid federally mandated rest days and, as a result, work more hours.

The similarly situated inquiry is flexible, common-sense, and factual. It asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?"

11

*Humphries v. CBOCS W., Inc*., 474 F.3d 387, 405 (7th Cir.2007). There must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id*. In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, considering all the circumstances, that an impermissible animus motivated the employer's decision. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

      Plaintiff's problem is that the information he has provided shows that Mays and Klausing are poor comparators. The Seventh Circuit has identified some factors to be used in judging whether comparators are similar enough, including "whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). Both Mays and Klausing appear to be engineers, but the Court has no information about the identity of their supervisors or the attendance standards to which the men were subject (since Plaintiff claims it wasn't the attendance policy). Plaintiff admits that the men did not have the same history of attendance issues that he did. (ECF No. 38 at 21) (Plaintiff "admits that Mays and Klausing are not ideal comparators, in that they do not have a similar record of attendance to his"). In short, Plaintiff's comparator evidence, if accepted as true, merely establishes that two men with no attendance issues were permitted by someone to work more than they were supposed to. This is dissimilar to Plaintiff, who had many attendance issues, was supervised by Wilson instead of an unnamed mystery supervisor and wanted to work less. If these men are appropriate comparators, the term "similarly situated" has lost all meaning.

**4.**     *Plaintiff's Arguments, Considered Collectively, are Insufficient*

Having rejected Plaintiff's arguments individually, the Court turns to reviewing them collectively. Taken as a whole, Plaintiff's designated evidence could not lead a reasonable jury to conclude that he suffered disability discrimination. Plaintiff violated Defendant's attendance policy not once but *six times*. Plaintiff's final violation of the attendance policy involved marking off for *twelve times* the number of days permitted by the policy. The last five incidents of discipline were signed off on by multiple people, with many having been unsuccessfully appealed by Plaintiff's union. None of Plaintiff's arguments, whether timing, pretext, or an imagined cat's paw, can overcome these undisputed facts. Plaintiff has not designated evidence that would allow his ADA claim to survive summary judgment, so judgment will be entered in Defendant's favor.

**C.**     ***No Reasonable Jury Could Conclude that Plaintiff was Retaliated Against***

Plaintiff's second claim is that he was terminated for reporting discrimination he was experiencing from Wilson. For a retaliation claim under the ADA, Plaintiff must submit evidence that (1) he engaged in protected activity, (2) his employer took an adverse action against him, and (3) there was a "'but for' causal connection between the two." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). Only the third element, causation, is disputed.

In deciding whether there is a genuine issue of material fact as to whether Plaintiff's protected activity caused his termination, the Court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz*, 834 F.3d at 764–66 (applying *Ortiz's* "evidence as a whole" standard to retaliation claims under Title VII and the Family Medical Leave Act); *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (applying *Ortiz* to a retaliation claim under the ADA). Circumstantial evidence of causation may include "(1)

suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands*, 901 F.3d at 802 (alteration in original) (quoting *Monroe*, 871 F.3d at 504).

The Court's discussion of Plaintiff's cat's paw and pretext arguments above apply with equal force to his retaliation claim, so those arguments will not be discussed again. Because the time frames are different, though, Plaintiff's timing arguments must be revisited.

Plaintiff points to three instances of protected activity that he believes caused adverse employment actions. The first two are non-starters. Plaintiff claims that his February 2018 and November 2018 caused his October 2019 and August 2019 disciplinary actions, respectively. These are eight- and ten-month gaps, respectively. Plaintiff speculates that Wilson spent these months "lying in wait," but these gaps are simply too long to support an inference of retaliation. *See Darchak*, 580 F.3d at 632.

The final instance is far closer in time to an adverse employment action but does little to help Plaintiff's cause. Plaintiff notes that, at the close of his Step 5 hearing, he said, "I feel this has been constant harassment by Damian Wilson because of our past lawsuit and litigations, EO and EEO complaints." (ECF No. 38-3 at 28). Because Plaintiff was terminated only days later, Plaintiff argues that "a reasonable juror could conclude that there is a causal connection between Padgett's complaint to Holmes and his termination." (ECF No. 28 at 16).

The Court cannot agree. This single sentence is three lines in a 50+ page transcript. Most of the transcript is testimony supporting the discipline. The Court does not believe that one could reasonably infer that Holmes based his termination decision on one sentence to the exclusion of

14

the rest of the record. And, of course, Holmes' decision was reviewed, and affirmed, on appeal, reducing the inference of any retaliatory intent. And even if the timing were suspicious, "[s]uspicious timing alone rarely establishes causation . . .." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). The Court does not believe that Plaintiff's statement, taken in context, could support a finding of retaliation.

Just as with his ADA claim, the record could not lead a reasonable juror to find retaliation. Again, Plaintiff went through a five-step process before his termination, repeating one step. His last violation was his most serious. The only reasonable inference that can be drawn from the record is that Plaintiff was fired because he repeatedly violated Defendant's attendance policy. Defendant is, then, entitled to summary judgment in its favor.

### III. Conclusion

For these reasons, Defendant's motion for summary judgment (ECF No. 30) is GRANTED. The Clerk is DIRECTED to enter judgment for Defendant and against Plaintiff.

SO ORDERED on October 25, 2022.

                                                 s/ Holly A. Brady
                                                 JUDGE HOLLY A. BRADY
                                                 UNITED STATES DISTRICT COURT